UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FRITZ ST. ANGE, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | 3:10-cv-79-WWE |
| | : | |
| ASML, Inc., and | : | |
| RICK THAYER, | : | |
|     Defendant. | : | |

**MEMORANDUM OF DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

In this action, plaintiff Fritz St. Ange has filed a second amended complaint pursuant to 42 U.S.C. § 1981 and Conn. Gen. Stat. § 31-290a, alleging (1) hostile work environment based on race and ethnic background; (2) retaliation for making complaints about such treatment; and (3) retaliation for making a workers' compensation claim. Defendants ASML, Inc. ("ASML") and Rick Thayer have filed a motion for summary judgment. For the following reasons, the motion for summary judgment will be granted in part and denied in part.

**BACKGROUND**

The parties have submitted statements of facts with accompanying exhibits and affidavits that reveal the following factual background.

Plaintiff, a black Haitian male, was hired by ASML's predecessor around October 2000, and he worked most recently as an Optician 3 in ASML's Continuous Polishing Department ("CP Department") in Wilton, Connecticut. According to an ASML Job description dated February 2004, an optician "typically handles parts that could weigh up to 50 pounds."[1] As an optician, plaintiff lifted glass lenses ("optics") and other parts, weighing between two (2) and ten

---

[1] Plaintiff disputes that he was ever made aware of the job description, or that he was ever required, in practice, to lift any parts weighing greater than ten pounds.

(10) pounds, on and off of large polishing machines, where he used a white paste-like substance called "slurry" to polish the optic surface. Plaintiff was required to stand, sit, kneel, and bend over machines in order to properly polish optics and perform routine departmental tasks.

ASML grants employees access to internal facilities within the Wilton worksite on a "need to know" basis, in order to protect proprietary technology and software. Consistent with employee policy, plaintiff signed an agreement acknowledging ASML's "need to know" rule, and obtained a badge granting access to only those areas of the plant necessary for his work. Plaintiff was responsible for reporting problems with his badge to his supervisor, Mike Kasmin, or to the Chief of Security, Kenneth Patenaude. Plaintiff was never given badge access to the CP department supply room.

Kasmin was in charge of assigning new projects and deadlines to the opticians, and sometimes project deadlines would be accelerated due to customer demand. Kasmin was also responsible for assigning overtime to opticians when necessary. If a project required overtime, Kasmin gave priority to the employee(s) already working on that project; but if the employee(s) did not want to work overtime, Kasmin would offer the overtime to the employee(s) whose skill set was best suited to the particular project. Kasmin did not select plaintiff to work on a desirable project in 2006, for which overtime employees would be paid double. However, ASML payroll records reflect that plaintiff worked overtime during every pay period in 2006 and worked the most overtime of any optician during several pay periods. Plaintiff's average overtime hours were not significantly different than those of his co-workers.

Kasmin and his manager, Cynthia Houston, set start times for employees in the CP department, and although other opticians on plaintiff's shift started at 6:30 a.m., originally

2

plaintiff was assigned to start work at 7:00 a.m.  In February 2007, plaintiff's start time was adjusted to 6:30 a.m.

In early January 2007, plaintiff's co-worker, Rick Thayer, complained to Kasmin that plaintiff was not keeping a common work area clean by failing to clean and store polishing weights.  Kasmin discussed the issue with plaintiff, who became upset and viewed Thayer's complaint as racial harassment.

On January 30, 2007, Kasmin met with plaintiff to give him his annual performance review and re-rate (i.e., merit raise).  Plaintiff was awarded a 3.5 percent salary increase, which was slightly greater than the average raise awarded to an Optician 3 that year.  Plaintiff was dissatisfied and told Kasmin that Cynthia Houston had promised plaintiff a "good raise."  Plaintiff told Kasmin that he didn't want the raise and that Kasmin should keep the money.  After the review and re-rate, plaintiff told a co-worker that he believed Kasmin was a racist who was "holding him back financially."  Plaintiff admits that Kasmin never said anything racist to him.

On January 31, 2007, plaintiff approached Cynthia Houston and accused Rick Thayer of "being racist" and "making racist comments," in violation of ASML's harassment policy.  Houston subsequently reported these allegations to Shannon Hildreth, ASML's on-site Human Resources Generalist.  Hildreth arranged a meeting with plaintiff for the same morning, where plaintiff told Hildreth of racial harassment he had been subjected to by Rick Thayer.  Specifically, plaintiff told Hildreth that: 1) Thayer, referring to a new black female employee in the CP department, said "she's beautiful for a black woman"; 2) Thayer made comments that blacks were lazy; and 3) Thayer made comments that plaintiff was "trying to look white" when

3

he spilled slurry on himself.[2]  Plaintiff testified that he was never physically threatened or intimidated; nobody ever called him by derogatory or racist names; besides Thayer, nobody else ever made inappropriate comments to him; he was not afraid to come to work; and his job performance was not affected.[3]  In a meeting between Hildreth and Thayer later on January 31, Thayer denied making any racist comments to plaintiff.  Thayer admitted that he said the new female black worker was "a good looking girl," but attributed "for a black girl" to a response made by plaintiff.  Thayer also admitted to making a variation of the comments that plaintiff looked white when he spilled slurry on himself, and that the comments was inappropriate, but maintained that the comments had been made in a joking context.  Hildreth cautioned Thayer against making any future comments that could be interpreted as inappropriate and told him that ASML would not tolerate any retaliation against plaintiff.  In a subsequent meeting between Hildreth and Kasmin, Kasmin reported that he had never witnessed Thayer make any inappropriate comments or otherwise mistreat plaintiff.

   Hildreth and Kasmin met with plaintiff later in the afternoon on January 31.  Hildreth explained the results of his investigation to plaintiff and informed him that he would be separating plaintiff's and Thayer's workstations from each other, in part because plaintiff had

---

[2] Parties dispute whether plaintiff originally denied that Thayer said anything racist to him; whether plaintiff told Hildreth of other racist remarks Thayer had made beyond these three; and whether plaintiff provided Hildreth with the name(s) of any witness(es) to these remarks. Parties also dispute the number of times Thayer made each comment. In a February 2009 affidavit, plaintiff described four other racist comments that Thayer had made to him: 1) Thayer asked whether plaintiff came to the U.S. on a boat; 2) Thayer said that all black people steal and do drugs; 3) Thayer said that black people are only good for playing sports; and 4) Thayer commented on news stories that "a black person must have done it."  Thayer denied making such comments.

[3] Plaintiff denies that his job performance was not affected by discrimination; however, plaintiff clearly testified at deposition that his job performance was not affected by discrimination.

indicated that he did not feel comfortable working with Thayer going forward. Plaintiff agreed that ASML could separate the workstations and thought it was a good idea to do so, but when asked if this resolution was sufficient, plaintiff replied, "I knew nothing would happen."

Hildreth instructed plaintiff's management team (Houston and Kasmin) to separate Thayer and plaintiff. Houston and Kasmin moved plaintiff's workstation approximately 15 feet. Plaintiff agreed that the move did not impact his job performance, and after the move, ASML did not receive any further complaints from plaintiff.

On January 12, 2007, plaintiff sustained a neck injury at work while lifting a heavy piece of equipment, which plaintiff described as "weighing a ton." Plaintiff reported his injury to ASML, who promptly submitted plaintiff's claim to its workers' compensation claims administrator, Matrix Absence Management, Inc. ("Matrix"). Plaintiff continued to work, and on March 23, 2007, plaintiff fell while climbing on top of an overturned bucket, injuring his hand, wrist, and elbow. Plaintiff reported the injury and continued to work at ASML until May 2, 2007, when his physician, Dr. Steven Fisher, ordered him unable to work due to a herniated cervical disc. Plaintiff was approved for a maximum leave of absence of sixteen (16) weeks pursuant to the Family and Medical Leave Act ("FMLA") and state law, but his doctor indicated that plaintiff could likely return in eight weeks, on July 5, 2007.

On May 17, plaintiff's neurosurgeon, Dr. Gary Zimmerman, recommended that in light of plaintiff's age and health, "timely" cervical surgery was the most reasonable option. On June 19, plaintiff filed a claim for workers' compensation benefits relevant to his January neck-related injuries. On June 29, Dr. Fisher noted that plaintiff must remain "out of work indefinitely" and cannot return until after surgery. On July 31, plaintiff filed a claim for workers' compensation

benefits relevant to injuries sustained from his fall in March.  Plaintiff testified that ASML was cooperative throughout the workers' compensation process.

From the start of plaintiff's leave in May until August 2007, ASML monitored plaintiff's work status closely by routinely seeking and receiving updates from Matrix on plaintiff's surgery date and his ability to return to work.  In early August 2007, Hildreth and ASML Human Resources Representative Bonnie Munroe requested an update from Sandra May, Integrated Claims Examiner at Matrix, on plaintiff's workers' compensation claim.  Sandra May reported that she did not see plaintiff returning to his full duty position in the foreseeable future as "a variety of roadblocks have been thrown up in this case, largely of the employee's making."[4]

Plaintiff was unable to return to work in any capacity as of August 22, 2007, by which time he had exhausted his sixteen (16) week FMLA approved leave.  ASML did not terminate plaintiff's employment at this time and continued to receive updates on plaintiff's work status.  ASML learned that plaintiff was scheduled to undergo surgery soon after the 2007 holidays.  However, after a December MRI of plaintiff's neck showed improvement, plaintiff opted to pursue physical therapy instead of surgery and return in six weeks for re-evaluation.

On January 23, 2008, Bonnie Munroe emailed Sandra May, inquiring as to when plaintiff could return to "light-duty" and when ASML would be receiving a more descriptive note.  Sandra May responded that Matrix had requested information from Dr. Zimmerman.  May also stated that she had a conference call with the ASML loss control department earlier in the day, and that ASML would need to consider "if they want him back at work in the first place."

Several weeks later, ASML received a note from Dr. Zimmernman dated February 12,

---

[4] Plaintiff disputes that he created any "roadblocks" to surgery, and alleges that Matrix created the roadblocks by failing to authorize the surgery until October 2007.

2008.  Dr. Zimmerman noted that plaintiff remained symptomatic and had deferred cervical surgery.  Dr. Zimmerman opined that plaintiff had a "light duty work capacity" that limited him to working no more than four hours a day with a ten (10) pound weight lifting restriction and no climbing, crawling, crouching, twisting, or bending.  Plaintiff was expected for a re-evaluation within two months.

Plaintiff's condition did not improve between February and July 2008, by which time plaintiff had been out on leave for a total of sixty-one (61) weeks.  In July, 2008, Hildreth emailed May, inquiring into what was being done to get plaintiff back to work, or, in the alternative, what ASML's payout liability would be if plaintiff's employment was terminated due to permanent disability.  Hildreth asked, "What is the timeline before we have a solution or recommendation on how to handle from Matrix?"  May responded, stating in part that:

> …while we usually urge employers to bring employees back in whatever capacity they can, I would be concerned that he would have a third accident.  It is also my understanding that he filed a prior lawsuit against the company although I don't know the details.  It has seemed to me it might be wiser to settle the existing claim outright.

Hildreth responded that she agreed that it would probably be in ASML's best interest to settle out right and terminate plaintiff's employment, and asked for a projected settlement monetary value. On July 10, Hildreth informed Sandra May that ASML would be terminating plaintiff's employment effective the following day.  In a letter dated July 11, Hildreth informed plaintiff that his employment with ASML was being terminated due to his having exhausted all of his FMLA approved leave, and invited him to reapply when his health allowed.

**DISCUSSION**

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. American International Group, Inc. v. London American International Corp., 664 F.2d 348, 351 (2d Cir. 1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Anderson, 477 U.S. at 249.

**Hostile Work Environment**

To establish a hostile work environment claim under 42 U.S.C. § 1981, plaintiff must show that the workplace at ASML was permeated with discriminatory intimidation, ridicule, and insult that was so severe or pervasive that it altered the conditions of his working environment. Patterson v. County of Oneida, N.Y., 375 F.3d 206, 227 (2d Cir. 2004). Whether conduct was so severe or pervasive as to create a hostile work environment depends on the totality of the

circumstances, including such factors as the frequency and severity of the discriminatory conduct, whether it was physically threatening or humiliating, or merely offensive, and whether it unreasonably interfered with the employee's work performance. Harris v. Forklift Systems, Inc., 510, U.S. 17, 23 (1993).

"[A]s a general rule, isolated instances of racially hostile name-calling and offensive remarks alone are ordinarily not severe enough to alter the conditions of employment." Thomas v. New York City Health and Hospitals Corp., 2004 WL 1962074 *12 (S.D.N.Y. 2004). Here, defendants' conduct was merely offensive. While Thayer's comments were reprehensible, they were not belligerent. Plaintiff was not physically threatened. Finally, plaintiff's job performance was not detrimentally affected. Plaintiff testified that his performance was great up until his leave of absence due to injury.

Based on the totality of the circumstances defendants' conduct was not so severe or pervasive as to create a hostile work environment. Therefore, defendants' motion for summary judgment will be granted as to plaintiff's hostile work environment claim.

**Retaliation Under Section 1981**

Plaintiff alleges that he was discharged in July, 2008 in retaliation for making his complaint of discrimination in January 2007. Retaliation claims under 42 U.S.C. § 1981 are evaluated using the three-step burden shifting analysis. Fincher v. Depository Trust, 604 F.3d 712, 720 (2d Cir. 2010). The plaintiff bears the initial burden of demonstrating a prima facie case. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the action, which if

proffered, places the burden back on the plaintiff to demonstrate that the proffered reason is a pretext for unlawful discrimination.  Id.

The elements of a prima facie retaliation claim are: (1) the plaintiff engaged in a protected activity; (2) the plaintiff suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action.  Patane v. Clark, 508 F.3d 106, 115 (2d Cir. 2007).  Here, defendant ASML only disputes the third element - a causal link.

The causal link between plaintiff's protected activity of making a complaint and his subsequent termination is the email from Matrix advising ASML that it might be wiser to settle than to bring plaintiff back.  This advice from Matrix came in response to an email from an ASML employee asking for recommendation on how to proceed.  The recommendation that plaintiff be terminated was based in part on plaintiff's "prior lawsuit" against the company.

ASML responds that plaintiff was terminated for a legitimate, non-discriminatory reason - because he had been out on leave for a total of 62 weeks, most of which was unapproved.  However, ASML knew this before it asked Matrix for a recommendation on how to proceed with plaintiff.  A reasonable jury could find that ASML's decision was based on plaintiff's prior discrimination complaints where, as here, the email correspondence referencing those complaints as reason to terminate him directly preceded plaintiff's termination.  This type of "smoking gun" evidence is sufficient to demonstrate pretext at the summary judgment stage.  Therefore, defendants' motion for summary judgment on plaintiff's Section 1981 retaliation claim will be denied.

**Retaliation Under Conn. Gen. Stat. § 31-290a (Workers' Compensation)**

Retaliation claims under § 31-290a use the same burden shifting framework that is applied to retaliation claims under Title VII and § 1981. <u>Ford v. Blue Cross & Blue Shield of Connecticut, Inc.</u>, 216 Conn. 40, 53-54 (1990).  ASML again claims that it had a legitimate, non-discriminatory reason for termination plaintiff's employment.  However, the analysis is the same as with plaintiff's 1981 retaliation claim.

In response to ASML's request for a recommendation on how to proceed regarding plaintiff's employment, Matrix responded: "I would be concerned that he would have a third accident."  Therefore, Matrix advised, it might be wiser to let plaintiff go.  The implication is clear.  Matrix recommended that plaintiff should be terminated in part because of plaintiff's proclivity for missing work under circumstances that make allowance for workers' compensation claims.  ASML then terminated plaintiff.

This evidence is sufficient to demonstrate pretext at the summary judgment stage.  Therefore, defendants' motion for summary judgment on plaintiff's workers' compensation-based retaliation claim will be denied.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED in part and DENIED in part.  Summary judgment for defendants is granted on plaintiff's hostile work environment claim, but plaintiff's retaliation claims remain.

Dated this 27th day of September, 2012 at Bridgeport, Connecticut.

_____/s/_____
WARREN W. EGINTON
SENIOR UNITED STATES DISTRICT JUDGE